UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE

Hilda Solis, Secretary,
United States Department of Labor,
    Plaintiff

    v.                                    Case No. 10-cv-572-SM
                                          Opinion No. 2012 DNH 120
The Home Insurance Company
and Roger A. Sevigny, New
Hampshire Insurance
Commissioner, as Liquidator
of the Home Insurance Company,
    Defendants

**O R D E R**

The Home Insurance Company ("Home") was declared insolvent
in 2003 by the New Hampshire Superior court, which ordered its
liquidation and appointed the New Hampshire Commissioner of
Insurance as liquidator.  During the subsequent insolvency
proceeding, the United States Department of Labor ("DOL") filed a
proof of claim seeking over $2.6 million in assessments allegedly
owed by Home to a "Special Fund" administered by DOL pursuant to
the Longshore and Harbor Workers' Compensation Act, 33 U.S.C.
§§ 901-50 (the "Longshore Act").  Applying state law — which
establishes the priority in which payments from the assets of
liquidated insurers are to be made — the Liquidator assigned
DOL's claim to priority Class III.  Home's assets are generally
thought to be insufficient to cover Class III claims, so it is
unlikely that DOL will recover anything substantial.  The

Department of Labor brought this suit against Home and Roger A.
Sevigny, New Hampshire's Insurance Commissioner and Liquidator of
Home, seeking a declaration that the Longshore Act preempts the
state's priority-setting statute.  Before the court is DOL's
motion for summary judgment (document no. 29).

## Standard of Review

When ruling on a motion for summary judgment, the court must
"view the entire record in the light most hospitable to the party
opposing summary judgment, indulging all reasonable inferences in
that party's favor."  Griggs-Ryan v. Smith, 904 F.2d 112, 115
(1st Cir. 1990).  Summary judgment is appropriate when the record
reveals "no genuine dispute as to any material fact and ... the
movant is entitled to judgment as a matter of law." Fed. R. Civ.
P. 56(a).  "[A] federal preemption ruling" involves "a pure
question of law."  United States v. Rhode Island Insurers'
Insolvency Fund, 80 F.3d 616, 619 (1st Cir. 1996) (hereinafter
"RIIIF").

## Background

The material facts are not in dispute.

I.   Procedural History

The New Hampshire Superior Court (Merrimack County) declared
Home insolvent and ordered its liquidation on June 13, 2003.  The

Liquidator (Sevigny) is "vested . . . with the title to all of
the property, contracts and rights of action and all of the books
and records of [Home]." N.H. Rev. Stat. Ann. ("RSA") § 402-C:21.
The Liquidator must review each claim filed in Home's
liquidation, and determine whether the claim should be allowed,
in what amount, and at what priority class level. After doing
so, the Liquidator presents his findings to the superior court in
the form of recommended action for the court's approval. RSA
402-C:45.

The DOL filed a proof of claim and an amended proof of claim
in 2003 and 2005, respectively, for assessments totaling
$2,672,527 that Home allegedly owes to DOL under the Longshore
Act for the period between 2000 - 2004 (collectively the
"claim"). In October 2010, the Liquidator issued a notice of
redetermination, which allowed DOL's claim in full. Pursuant to
New Hampshire's priority statute (RSA 402-C:44), however, the
Liquidator assigned DOL's claim a Class III priority. He also
rejected DOL's argument that state priority law does not apply
because it is preempted by the Longshore Act.

Unhappy with the Liquidator's decision, DOL filed this
federal declaratory judgment action to press the preemption
issue. It also asserted, on alternative state law grounds, that

its claim against Home's assets is entitled to either a Class I
or Class II priority. The superior court stayed the liquidation
proceedings with respect to the DOL's claim pending the outcome
of this case. This court denied the defendants' motion to
dismiss DOL's federal preemption cause of action, but granted,
under Wilton v. Seven Falls Co., 515 U.S. 277 (1995), their
motion to dismiss the state law claims. See Document No. 40. In
addition, the Guaranty Funds were allowed to intervene to protect
their rights as Class II claimants.[1]  Id.


II.  The State Liquidation Statute and Priority Provision

The New Hampshire Insurer Liquidation Act, RSA 402-C
("Liquidation Act"), provides a comprehensive statutory framework
governing the rehabilitation or liquidation of troubled insurance
companies. Under the Act, the assets of an insolvent insurer are
distributed to claimants, as allowed by the liquidator "[u]nder
the direction of the [state] court," and in accordance with
statutory priorities. RSA 402-C:46, I. Those priorities are set
out in RSA 402-C:44 (the "state priority law"), which establishes

---

[1]  The intervenor "Guaranty Funds" are insurance guaranty funds
and associations from fifteen states. They are statutory
entities created, and governed by the laws of their respective
jurisdictions, to provide protection to policyholders from
hardships occasioned by property and casualty insurer
insolvencies. They have claims against the assets of Home by
virtue of assessments against Home as a "member insurer" of the
funds.

ten priority classes.  The first three classes are relevant to DOL's claim in this case.  Id.  Class I includes the "costs and expenses of administration" of the insolvent insurer's estate. Id.  Class II claims are "Policy Related Claims," including "claims of the New Hampshire Insurance Guaranty Association, the New Hampshire Life and Health Insurance Guaranty Association and any similar organization in another state."  Id.  Class III claims are "Claims of the Federal Government."  Id.  Every claim in a given priority class must be paid in full (or adequate funds retained for payment in full) before any payment is made on claims of the next lower class.  Id.

III. <u>The Federal Longshore Act</u>

    *A.  Generally*

    DOL's claim against the assets of Home arises from assessments DOL levied against Home pursuant to the Longshore Act.  The Longshore Act creates "an extensive workers' compensation program that protects longshore and other specific classes of workers whose injuries occur upon navigable waters of the United States or adjoining facilities like piers and dry docks."  <u>Reich v. Bath Iron Works Corp.</u>, 42 F.3d 74, 75 (1st Cir. 1994) (citing 33 U.S.C. § 903(a)).  The Longshore Act is similar to workers' compensation programs "provided by many states for non-maritime workers."  <u>B.S. Costello, Inc. v. Meagher</u>, 867 F.2d

722, 723 (1st Cir. 1989).  It "establishes benefits to workers
without regard to the employer's fault, but, at the same time, it
eliminates common law tort liability and limits the employer's
liability to predictable amounts." Id.  The purpose of the
Longshore Act, therefore, is "to afford expeditious relief to
injured workers while distributing their economic losses on to
industry and the consuming public." Id.

    The Longshore Act sets the amount and duration of
compensation payments it requires employers to make to their
injured employees.  Employers must "secure the payment of
compensation" either (1) through a contract with an insurance
carrier or (2) by qualifying as a self-insurer with the DOL.  33
U.S.C. § 932(a).  Insurance carriers must receive authorization
from the Secretary before they can insure the "payment of . . .
compensation," id., and must disclose to the Secretary a "full
and complete statement of [their] financial condition."  20
C.F.R. § 703.102.  In deciding whether to authorize an insurance
carrier to provide insurance under the Longshore Act, the
Secretary may consider the recommendation of "any State authority
having supervision over carriers or over workmen's compensation."
33 U.S.C. § 932(b).  The Secretary may suspend or revoke its
authorization for good cause shown.  Id.

Because "employees' claims will . . . commonly be handled by an insurance carrier, the [Longshore Act] facilitates claim administration by allowing the Secretary of Labor to substitute the carrier for the employer for purposes of administrative proceedings and orders." B.S. Costello, 867 F.2d at 724. Nevertheless, and "notwithstanding the important role carved out for insurance carriers," employers remain liable for compensation despite any insurance. Id.

### B.   The Special Fund: § 944

Section 944 of the Longshore Act creates a "Special Fund" of money held in trust and administered by DOL.  33 U.S.C. § 944(a). The Special Fund operates primarily (1) to provide to "second injury" workers compensation beyond that which employers are required to provide (33 U.S.C. § 908), and (2) to provide compensation to workers in the event of employer insolvency (33 U.S.C. § 918).  See 33 U.S.C. § 944(I).  Section 944 authorizes the Secretary to fund the Special Fund through annual assessments on self-insured employers and insurance carriers.  See 33 U.S.C. § 944(c)(2).[2]

---

[2]  Section 944 of the Longshore Act provides in pertinent part:

§ 944. Special fund

(a) Establishment; administration; custody, trust

There is established in the Treasury of the United States a

(1)  *Second Injury Payments from the Special Fund*

Employer liability for worker compensation under the
Longshore Act is limited in cases of "second injury," that is,
where a partially disabled worker suffers a work-related injury
that increases her disability.  Under such circumstances, the
employer is usually liable only for 104 weeks of compensation
payments.  33 U.S.C. § 908(f)(1); 20 C.F.R. 702.145(b)(2010).
After that period, liability for payments shifts to the Special
Fund.  33 U.S.C. § 908(f); <u>Reich</u>, 42 F.3d at 77 (Section 944
"mak[es] the special fund, and not the employer, liable . . . for
so-called 'second injury' compensation payments").

―――――――――――――――

special fund.  Such fund shall be administered by the Secretary.
The Treasurer of the United States shall be the custodian of such
fund, and all moneys and securities in such fund shall be held in
trust by such Treasurer and shall not be money or property of the
United States.

* * *

(c) Payments into fund

Payments into such fund shall be made as follows:

* * *

    (2) At the beginning of each calendar year the Secretary
shall estimate the probable expenses of the fund during that
calendar year and the amount of payments required (and the
schedule therefor) to maintain adequate reserves in the fund.
Each carrier and self-insurer shall make payments into the fund
on a prorated assessment by the Secretary [as] determined
[below].

33 U.S.C. § 944.

Shifting liability to the Special Fund is meant "to
encourage employers to hire workers who have a previous partial
permanent disability." Reich, 42 F.3d at 77.  "For various
reasons, employers feared that such a worker who suffered a new
disability might impose extra liability on the employer where the
first injury contributed to the severity of the second; a good
example is the loss of an eye by a worker already blind in one
eye."  Id. (emphasis in original).

> (2)  *Payments from the Special Fund in the
>       Event of Employer Insolvency*

The Secretary may also, in her discretion, disburse so-
called "Section 918" payments from the Special Fund to workers
whose employers have defaulted on paying compensation.  See 33
U.S.C. §§ 918(b), 944(I).  That relief is available to workers
who have secured federal court judgments against their employers,
but the judgment cannot be satisfied because of employer
"insolvency or other circumstances precluding payment."  33
U.S.C. § 918(b).[3]  In other words, Section 918 payments from the
Special Fund act as a safety net with respect to the relationship

---

[3]  In addition, and on a much smaller scale, Special Fund monies
are used to provide workers with information and legal advice and
to defray medical examination expenses.  33 U.S.C. § 944(I).

between worker and employer.[4]  However, the Special Fund does not pay compensation to claimants where an insurer becomes insolvent. See 33 U.S.C. § 944.  See also B.S. Costello, 867 F.2d at 724 (when insurer becomes insolvent, employer is liable for compensation).

> (3)  *Special Fund Assessments*

Special Fund monies come primarily from insurance carriers and self-insured employers.  See 33 U.S.C. § 944(c)(2).  Section 944(c)(2) (the "Assessment Provision") charges the Secretary with "maintain[ing] adequate reserves in the fund," and grants her the authority to levy assessments necessary to accomplish that goal. Id.  The Assessment Provision establishes a formula for calculating annual assessments, which applies specifically to "carrier[s] and self-insurer[s]."  Id.  The Secretary first "estimate[s] the fund's expected obligations for the forthcoming year."  Reich, 42 F.3d at 75 (citing 33 U.S.C. § 944(c)(2)). Nothing in § 944 appears to limit the Secretary from increasing her estimate of probable expenses to cover assessments unpaid by

---

[4]  Where an insurer is insolvent, DOL may seek compensation from the employer in lieu of payments from the insolvent insurer.  If the employer, too, is insolvent, DOL may withdraw funds from security deposits previously posted by the insurer.  See "Dep't of Labor, Notice re: Regulations Implementing the Longshore and Harbor Workers' Compensation Act and Related Statutes," 70 Fed. Reg. 43224 (July 26, 2005).

insolvent insurers.  From her estimate of probable expenses, the Secretary then subtracts "other fund income (<u>e.g.</u>, fines)."[5]  <u>Id</u>. The remaining balance represents the amount that must be funded through assessments.  <u>Id</u>.  In determining how much to assess against each self-insured employer or insurance carrier, the Secretary applies a calculation that takes into consideration each entity's compensation payments during the preceding calendar year and second injury payments made during the preceding calendar year that are "attributable to" each entity.  <u>Id</u>. at 75- 76 (citing 33 U.S.C. § 944(c)(2)).  Unpaid assessments are collected "by civil suit brought by the Secretary."  33 U.S.C. § 944(h).  <u>See also</u> 20 C.F.R. § 702.147(c).

For fiscal years 2000 - 2004, assessments against insurance carriers comprised more than ninety-nine percent of the Special Funds' revenues.  Payments made from the Fund during that same period consisted primarily of second injury payments, which accounted for over 90% of all Special Fund outlays.  The next largest category of Special Fund payments for that period consisted of "Section 918" payments, which comprised less than 5% of payments from the Special Fund.

---

[5]  The Special Fund is also funded in small part by amounts collected as fines and penalties and from employers when there is no person entitled to receive benefits upon the death of a covered employee.  33 U.S.C. § 944(c)(1),(3).

**Discussion**

The federal priority statute, 31 U.S.C. § 3713, provides that a "claim of the United States Government shall be paid first when . . . a person indebted to the Government is insolvent and . . . an act of bankruptcy is committed."  31 U.S.C. §§ 3713(a)(1)(A)(iii).  DOL's claim, then, is arguably entitled to first priority in the state insolvency proceedings, notwithstanding the contrary state priority law.  However, the Supreme Court, in United States Dept. of Treasury v. Fabe, 508 U.S. 491 (1993), held that, to the extent a state statute protects policyholders by requiring a different priority class for federal claims in insurance insolvency proceedings, it may supersede the federal priority statute under the McCarran-Ferguson Act, which seeks to preserve "the supremacy of the States in the realm of insurance regulation."  Id. at 500.  See also Ruthardt v. United States, 303 F.3d 375, 379-384 (1st Cir. 2002) (applying Fabe and holding that federal claim priority statute was reverse-preempted by Massachusetts insurer insolvency priority law).  Because Fabe precludes application of the federal priority statute to DOL's claim, DOL seeks to conjure up a similar "absolute priority" requirement (document no. 29-1, at 1) from the Assessment Provision of subsection 944(c)(2) of the Longshore Act - one DOL contends can survive reverse-preemption under McCarran-Ferguson.

In response, defendants and intervenors (collectively "defendants") point out that the Assessment Provision of the Longshore Act contains no explicit priority requirement, and they further note that the provision does not impliedly create one. Absent such a priority requirement, defendants contend, there is no conflict between federal law and the state's priority law. So, no federal preemption issue arises.  Defendants also argue, in the alternative, that, even if the court were to find that the Assessment Provision would normally preempt the state's priority law under conventional preemption principles, the McCarran-Ferguson Act protects the state law and renders the federal law reverse-preempted.

I.   <u>Conventional Preemption Analysis</u>

    A.   <u>Presumption Against Preemption</u>

In determining whether the federal law at issue here preempts the state priority law, the court is guided by the "two cornerstones of . . . preemption jurisprudence."  <u>Wyeth v. Levine</u>, 555 U.S. 555, 565 (2009).  First, "the purpose of Congress is the ultimate touchstone in every pre-emption case." <u>Id</u>. (internal quotation marks omitted).  Second, there is a "presumption against preemption," especially where state law operates in a field "traditionally occupied" by the states. <u>Massachusetts Med. Soc'y v. Dukakis</u>, 815 F.2d 790, 792, 796 (1st

Cir. 1987).  The Supreme Court in <u>Wyeth</u> recently "put renewed emphasis on the presumption against preemption," <u>Genesee Cnty. Employees' Ret. Sys. v. Thornburg Mortg. Sec. Trust</u>, No. Civ. 09-0300JB/KBM, 2011 WL 5840482, at *46 (D.N.M. Nov. 12, 2011), by clarifying that it applies in all preemption cases, including those in which conflict-preemption is claimed.  <u>See</u> <u>Wyeth</u>, 555 U.S. at 624 n.14 (Alito, J. dissenting).

Here, the presumption that the federal statute does not preempt the state's priority law is "particularly strong," <u>Rhode Island Hospitality Ass'n v. City of Providence</u>, __ F.3d. __, 2011 WL 6004385, at *21 (1st Cir. Dec. 2, 2011) (Stahl, J., concurring), because the insurance field, and the sub-field of insurance insolvency, are areas traditionally occupied by the states.  <u>See</u> <u>In re Union Guarantee & Mortg. Co.</u>, 75 F.2d 984, 984-95 (2d Cir. 1935) ("Congress meant to leave to local winding up statutes the liquidation of such companies; . . . since the states commonly kept supervision over them during their lives, it was reasonable that they should take charge on their demise.").

  B.  <u>Preemption Theories Generally</u>

There are two general types of federal preemption — express and implied.  <u>Liberty Cabelvision of Puerto Rico, Inc. v. Municipality of Caguas</u>, 417 F.3d 216, 220 (1st Cir. 2005).

Express preemption occurs where Congress has used "explicit preemptive language." Id. Where Congress has not employed such language, its preemptive intent may, nevertheless, be implied from the statute's "structure and purpose." Jones v. Rath Packing Co., 430 U.S. 519, 525 (1977); Geir v. Am. Honda Motor Co., 529 U.S. 861, 885 (2000) ("[T]his Court traditionally distinguishes between 'express' and 'implied' pre-emptive intent . . . ."). There are three forms of implied preemption. "Field" preemption occurs where the "scheme of federal regulation [is] so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it." Rice v. Santa Fe Elevator Corp. 331 U.S. 218, 230 (1947). "Impossibility" preemption "arises where federal and state law 'impose directly conflicting duties,' e.g., 'if the federal law said, "you must sell insurance," while the state law said, "you may not."'" Bartlett v. Mut. Pharm. Co., 659 F. Supp. 2d 279, 293 (D.N.H. 2009) (LaPlante, J.) (quoting Barnett Bank of Marion Cnty, N.A. v. Nelson, 517 U.S. 25, 31 (1996)). The third type of implied preemption is "obstacle" preemption, which occurs where state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." Hines v. Davidowitz, 312 U.S. 52, 67 (1941). Both impossibility and obstacle preemption are so-called "conflict pre-emption" theories, which

require an "actual conflict" between the federal and state law.
Freightliner Corp. v. Myrick, 514 U.S. 280, 287 (1995).

In this case there is no express preemption because neither
Section 944, nor the Assessment Provision of sub-section 944
(c)(2), contains explicit preemptive language.  DOL does not
contend otherwise.  DOL's position rests, instead, on the implied
preemption theories of "impossibility" and "obstacle" preemption.
Specifically, DOL says it is impossible for the defendants to
comply with both their duty under § 944 to pay Home's assessment
to the Special Fund and their duty under the state's priority law
to pay Class I and Class II claims ahead of DOL's claim.  In
addition, DOL contends that, in the present case, the state law
stands as an "obstacle" to the purposes and objectives of the
federal law.

C.   Impossibility Preemption

DOL bears a "demanding" burden to present "clear evidence"
that "'compliance with both [the] federal and state [laws] is a
physical impossibility.'"  Wyeth, 555 U.S. at 571, 573, 589
(2009) (quoting Florida Lime & Avocado Growers, Inc. v. Paul, 373
U.S. 132, 142-143 (1963)).[6]  DOL argues that defendants cannot

_____

[6]  DOL says it is asserting an "as-applied" impossibility theory,
i.e., that in this case, because there are not enough Home assets
to pay Class III claims, compliance with both the federal statute

16

comply with both state and federal law because federal law requires them to pay the federal assessment, but the state's priority law forbids payment because Home's assets are insufficient to pay DOL's Class III claim.

The argument is difficult for several reasons.  First, it incorrectly frames the conflict.  See Bartlett, 659 F. Supp. 2d at 293 (parties claiming impossibility preemption are required to "fit their claimed predicament" into the relevant "framework").  A conflict exists in this case if defendants' compliance with the state's priority law would "run[…] afoul" of the Assessment Provision.  Id. at 290.  Answering that question, i.e., whether application of the state's priority law to DOL's claim would result in violation of the Assessment Provision of Section 944(c)(2), requires resolution of a subsidiary issue: Does that section command something that state law forbids?  See id. at 293 ("[D]efendants would need to show a federal law saying 'You may not change your label' to conflict with the state law underlying the Bartletts' failure-to-warn claims, i.e., 'You must change your label.' So the defendants' assertion that the FDCA does not say one way or the other whether they can change their label is

---

and the state priority law is not possible.  Defendant responds, in part, that there is no impossibility because in other cases insurer assets may be sufficient to pay Longshore Act assessments.  The court addresses DOL's theory as presented.

insufficient.") (emphasis in original).  Given that the state's
priority law rules out Class I priority for DOL's claim, DOL must
show that the Assessment Provision requires it.  In other words,
it is not enough to show the obvious — that the federal
Assessment Provision creates an assessment claim.  Of course it
does.  DOL must also show that the Assessment Provision creates a
right of absolute priority for such a claim in state insurance
insolvency proceedings.  No express language in either Section
944 or in the Assessment Provision of subsection 944(c)(2)
provides that assessments are entitled to absolute priority (or
any priority).  Similarly, no other provision of the Longshore
Act speaks to the issue of assessment claim priority.  DOL's
argument, therefore, rests entirely on the notion that a
preferential priority is implied.  That argument is unsupported.

     It is commonly understood that a debt obligation (a "claim")
and the priority assigned to such an obligation in insolvency or
bankruptcy proceedings are distinct.  See generally Bankruptcy
Code, 11 U.S.C. § 507(a) ("The following expenses and claims have
priority in the following order . . .).  Congress fully
understands that difference, see id., and has long created
priorities for federal claims directly and expressly.  For
example, since 1797 Congress has provided priority for federal
claims in insolvency proceedings through express statutory

command in the federal priority statute.  <u>See</u> Act of Mar. 3,
1797, ch. 20, §5, 1 Stat. 515 (1797), <u>current version at</u> 31
U.S.C. § 3713.  Congress has also expressly set forth a priority
scheme for federal claims in bankruptcy proceedings.  <u>See</u> 11
U.S.C. § 507; <u>see also</u> <u>United States v. Romani</u>, 523 U.S. 517, 531
(1998).  Except for federal tax claims, claims of the United
States have been treated as general creditor claims in bankruptcy
cases for over a hundred years.  <u>See</u> <u>id</u>.

    In the context of the Longshore Act, legislative history
shows that when Congress meant to provide a specific priority it
did so directly and expressly.  Before 1978, § 917(a) of the
Longshore Act expressly required that compensation claims be
given a preferential priority in both employer and insurer
insolvencies:

> Any person entitled to compensation under provisions of
> this Act <u>shall have a lien</u> against the assets of the
> carrier or employer for such compensation without limit
> of amount, and shall, upon insolvency, bankruptcy, or
> reorganization in bankruptcy proceedings of the carrier
> or employer, or both, <u>be entitled to preference and
> priority in the distribution of the assets of such
> carrier or employer, or both</u>.

33 U.S.C. § 917(a), as amended by Pub. L. No. 92-576 (1972)
(emphasis added).  Congress repealed that subsection as part of
the Bankruptcy Reform Act of 1978.  Pub. L. No. 95-598, tit. III,
§ 324, 92 Stat. 2679.  Congress sought to eliminate the "special

priority and super-priority lien" created by § 917(a) in order to promote "equality of treatment of all creditors" in bankruptcy proceedings.  S.Rep. No. 95-989, at 159 (1978), reprinted in 1978 U.S.C.C.A.N. 5787, 5950.  Both the enactment and subsequent repeal of § 917(a) demonstrate that Congress did not overlook the matter of preferential priorities in the Longshore Act, and they provide strong evidence that Congress did not mean to create additional priorities.  Cf. Wyeth, 555 U.S. at 567, 574-75 (fact that Congress expressly dealt with issue in one part of federal statute but was silent as to same issue in another part of the same statute was "powerful evidence" of its intent).  Had Congress wanted to create an absolute priority in Section 944, it could easily have done so.  See e.g., Pacific Operators Offshore, LLP v. Valladolid, ___ U.S. ___, 2012 WL 75045, at *9 (January 11, 2012) ("[I]t is unlikely that Congress intended to impose [the Longshore Act] situs-of-injury requirement" in a related federal statute because "creating an express situs-of-injury requirement in the text [of that related statute] . . . would have been simple.")

        Moreover, Congress's repeal of § 917(a) of the Longshore Act in the Bankruptcy Reform Act of 1978 was part of a larger effort to eliminate piecemeal treatment of priorities.  The Bankruptcy Reform Act repealed many priority provisions.  See Bankruptcy

Reform Act of 1978, tit. III.  The House legislative report
noted:

> When an insolvent estate is liquidated and the proceeds
> distributed under the bankruptcy laws, myriad other
> laws that reorder the priorities fixed in the
> bankruptcy code create confusion and unfairness . . . .
> Thus, the bill, in the interest of a coherent
> bankruptcy policy, eliminates special priorities found
> in other laws and brings all priorities into the
> bankruptcy code itself.

H.R. Rep. No. 95-595, 95th Cong., 1st Sess. 252 (1977) <u>reprinted
in</u> 1978 U.S.C.C.A.N. at 6242.  The Bankruptcy Reform Act also
made the federal priority statute inapplicable to bankruptcy
proceedings.  <u>See</u> 31 U.S.C. § 3713(a)(2).  Congress's intent to
provide for a more unified and less piecemeal treatment of
priorities, including priorities for the federal government's
claims, is manifest in these legislative changes.

     At bottom, there is nothing to suggest that Congress meant
to attach "absolute priority" status to assessments made under
Section 944.  And such a requirement should not be inferred from
Congress's silence in Section 944, particularly given that
Congress normally addresses priority issues expressly, including
within the Longshore Act itself.  <u>See generally</u> <u>Edmonds v.
Compagnie Generale Transatlantique</u>, 443 U.S. 256, 266-67 (1979)
(refusing to infer from amendment to the Longshore Act a
Congressional intent to change pre-existing rights where the

statutory language was silent and the legislative history did not
support it).

Because neither Section 944 as a whole, nor its Assessment
Provision in particular, assigns a preferential priority status
to DOL's claim there is no "actual conflict," <u>Freightliner</u>, 514
U.S. at 287, with the state's priority law assigning DOL's claim
Class III status.   In short, it is not "impossible" for
defendants to comply with both the state and federal laws because
federal law does not command something that state law forbids.

D.   <u>Obstacle Preemption</u>

The Assessment Provision supports the Special Fund's
objective of providing funds for injured workers.   <u>See</u> discussion
<u>supra</u> at Background Part 3.b.   DOL's primary "obstacle
preemption" argument is that the state's priority law is
preempted because, under the circumstances of this case, that law
impairs the Special Fund's ability to make compensation payments
to injured workers.   Defendants do not deny that compensation
payments from the Special Fund promote the Fund's dual mission of
encouraging employer hiring of second injury workers and helping
injured workers whose employers have become insolvent.   <u>See</u>
Document No. 33, at 5, 13-14.   They contend, however, that DOL's
inability to collect Home's assessment does not, in fact, impair

22

the Special Fund's ability to carry out those purposes.  See i.d.
at 17; Document No. 42, at 9.

As an initial matter, the court notes that "there is always
a federal interest to collect moneys" which are owed the
government.  United States v. Yazell, 382 U.S. 341, 348 (1966).
However, "generalities as to the paramountcy of th[at] federal
interest do not lead inevitably to" a "total disregard of state
laws."  Id. at 349 (holding, federal interest in collecting on
Small Business Administration loan did not require extending a
preferred right to proceed against wife's separate property to
the government, in contravention of state law of coverture).
DOL's general interest in having its assessments paid is, in
similar way, not an interest sufficient to overcome the state
priority law under a theory of obstacle preemption.

As for DOL's argument that application of the state priority
law will obstruct the specific purposes of the Special Fund, the
court finds the facts unsupportive.  As defendants point out, the
Secretary may offset Home's unpaid assessment by increasing next
year's assessments against other carriers and self-insured
employers.  DOL does not suggest that the statute expressly or
impliedly limits the Secretary's authority to redistribute the
cost of Home's unpaid assessment.  Indeed, DOL concedes that the

Assessment Provision allows her to do so.  <u>See</u> Document No. 46
at 6.  The Secretary's statutory duty to "maintain adequate
reserves in the fund," 33 U.S.C. § 944(c)(2), suggests that she
may well be obligated to exercise her authority as necessary to
offset the Special Fund's losses.

DOL insists, nevertheless, that even if the Secretary's
ability to recoup Home's unpaid assessments means that the state
law does not impair the Special Fund's overall purposes,
recoupment would impair a subsidiary purpose of the Assessment
Provision.  That subsidiary purpose - which defendants do not
disclaim - is the spreading of Special Fund costs among industry
participants.  DOL essentially argues that Congress intended that
cost-spreading among industry participants include even insurers
in liquidation.  Defendants say that expression of Congressional
intent is incorrect, and that while the subsidiary purpose of the
Assessment Provision is certainly to spread costs among insurance
carriers and self-insured employers, Congress did not "say[…]
anything about what should happen if an insurer is insolvent."
Document No. 51, at 2.

The court rejects as "untenable" DOL's articulation of
Congress's cost-spreading purpose.  <u>Wyeth</u>, 555 U.S. at 573
(finding no obstacle preemption where petitioner's proffered

articulation of congressional purpose "relie[d] on an untenable
interpretation of congressional intent").  Nothing suggests
Congressional intent to preclude redistribution of the cost of
unpaid insurer assessments.  Indeed, that the Assessment
Provision authorizes the Secretary to effect such a re-
distribution suggests otherwise.[7]  Congress's silence in Section
944 does not suggest an intent to create a cost-spreading scheme
so critical that it necessarily displaces state insurer
insolvency priority laws.  See Marsh v. Rosenbloom, 499 F.3d 165,
178-79 (2d Cir. 2007) (state statute of limitations did not
present an obstacle to accomplishment of federal environmental
law's cost-sharing objective, even where its application would
reduce funds otherwise available from responsible parties for
environmental clean-up; federal statute's cost-sharing objective
"while strong, [was] not absolute").

In sum, the state's priority law, as applied in this case,
poses an obstacle neither to the primary purposes of the Special

---

[7]  In this as-applied challenge to the state priority law, the
comparative size of the actual loss that DOL must recoup among
the remaining industry participants is relevant.  The evidence
shows that Home's assessments are small in comparison to the
total annual assessments to the Special Fund.  For example,
Home's 2004 assessment ($586,595), was less than one-half of one-
percent of the Special Fund's total assessments ($135,813,028).
Under these circumstances, spreading the loss among remaining
industry participants would not seem to pose a risk of
significant disruption with respect to any identified statutory
purposes.

Fund nor to the Assessment Provision's subsidiary purpose of spreading Special Fund costs among industry participants. As to both its impossibility and obstacle preemption arguments, therefore, the court finds that DOL has failed to overcome the presumption that Congress did not intend, when it created an assessment mechanism to fund the Special Fund, to displace state priority laws operating in the field of insurer insolvency proceedings, a field traditionally occupied by the states.

II. <u>Reverse Preemption Under the McCarran-Ferguson Act</u>

Even assuming that Section 944, and the Assessment Provision of subsection 944(c)(2), preempt, under normal preemption principles, the state's priority law, the McCarran-Ferguson Act prohibits that result. The federal statutory provisions at issue here do not "specifically relate to the business of insurance," 15 U.S.C. §§ 1011-1015, and, therefore, do not strip the state's priority law of McCarran-Ferguson's protection.

The McCarran-Ferguson Act, 15 U.S.C. § 1011 et seq., was enacted to protect "'the continued regulation and taxation by the several States of the business of insurance.'" <u>Fabe</u>, 508 U.S. at 500 (quoting 15 U.S.C. § 1011). Toward that end, the first section of the Act explicitly provides "that silence on the part of the Congress shall not be construed to impose any barrier to

[such] . . . regulation or taxation . . . ."  15 U.S.C. § 1011.
The Act, therefore, prohibits federal preemption of state laws
that regulate insurance, "unless the federal statute expressly
announce[s] Congress's specific intention to inject itself into
the area of state insurance law."  RIIIF, 80 F.3d at 620
(requiring a "clear statement" of congressional intent to intrude
upon state insurance regulation).  "[I]nadvertent federal
intrusion," therefore, is not enough to strip a state law of the
Act's protection.  Id.[8]

     For McCarran-Ferguson to protect a state law from the
application of "normal federal preemption principles," "three
conditions" must be met.  Id. at 619.  First, the federal statute
"must not 'specifically relat[e] to the business of insurance.'"
Id. (quoting 15 U.S.C. § 1012).  Second, the state law "must have

_____

[8]  The McCarran-Ferguson Act provides in pertinent part:

(a) The business of insurance, and every person engaged therein,
shall be subject to the laws of the several States which relate
to the regulation or taxation of such business.

(b) [First Clause] No Act of Congress shall be construed to
invalidate, impair, or supersede any law enacted by any State for
the purpose of regulating the business of insurance, or which
imposes a fee or tax upon such business, unless such Act
specifically relates to the business of insurance:

[Second Clause] Provided, That ... [the Sherman, Clayton, and FTC
antitrust acts] shall be applicable to the business of insurance
to the extent that such business is not regulated by State law.

15 U.S.C. § 1012 (alterations added).

been enacted 'for the purpose of regulating the business of
insurance.'"  <u>Id</u>.  Third, the federal statute must "'invalidate,
impair, or supersede'" the state law.  <u>Id</u>.  Here, the parties
agree that the second condition is met in that New Hampshire's
insurer insolvency priority law regulates the business of
insurance.  <u>See generally</u> <u>Ruthardt</u>, 303 F.3d at 379-84
(Massachusetts insurer insolvency priority law, in part,
regulated the business of insurance).  Moreover, for purposes of
this analysis the court assumes that the third condition is also
met, <u>i.e.</u>, that the federal law supersedes the state priority law
under normal preemption principles.  What remains primarily in
dispute is the first condition - whether the federal law is
"specifically related to the business of insurance."

        Here, the relevant federal law is Section 944 of the
Longshore Act, and, more specifically, the Assessment Provision
of subsection 944(c)(2).  Although DOL points to many provisions
of the Longshore Act that might support its contention that the
Act as a whole relates to the "business of insurance," precedent
employing the McCarran-Ferguson analysis suggests that the proper
focus is on the allegedly preemptive provision, and not on the
entire federal statute.  <u>See</u> <u>e.g.</u>, <u>RIIIF</u>, 80 F.3d at 621-22
(applying McCarran-Ferguson analysis to Medicare secondary payer
provision, not entire Medicare program).  <u>See also</u> <u>Barnett Bank</u>,

517 U.S. at 38 (applying McCarran-Ferguson analysis to section 13 of the Bank Act); Blackfeet Nat'l Bank v. Nelson, 171 F.3d 1237, 1249 (11th Cir. 1999) (holding that, unlike section 13 of the Bank Act, section 24 (Seventh) of the same Act does not specifically relate to the business of insurance).

A.   "Specific Relation"

The requirement under McCarran-Ferguson that the relevant federal statutory provision "specifically" relate to the business of insurance means that the provision must not simply "encompass" the business of insurance by implication through language of "general application."  RIIIF, 80 F.3d at 620.  Rather, it must "explicity, particularly, [or] definitely" refer to insurance. Barnett Bank, 517 U.S. at 38 (1996) (quotation omitted). Defendants here concede that the Assessment Provision makes "specific," i.e., explicit, reference to insurance, in that it authorizes the Secretary to fund the Special Fund through assessments against "carrier[s] and self-insurer[s]."

B.   "Business of Insurance"

A federal statutory provision is related to the "business of insurance" where it affects the "core relationship between a private insurer and its insured." RIIIF, 80 F.3d at 621.  Matters at the "core" of that relationship include:

29

'the type of [insurance] policy that could be issued,
its reliability, interpretation, and enforcement' . . .
as well as the standards governing performance under
insurance contracts.

Id. at 621-22 (quoting Fabe, 508 U.S. at 501, 508-10) (citations

omitted).  As the Court in Fabe explained, "the focus . . . is

upon the relationship between the insurance company and its

policyholders."  Fabe, 508 U.S. at 501.


Applying these principles, the Court in Barnett Bank found

that the federal statutory provision at issue there related to

the "business of insurance" where it "explicitly grant[ed to]

national banks permission to: (1) "'act as the agent for any

fire, life, or other insurance company,'" (2)"to 'solici[t] and

sel[l] insurance,'" (3) to "'collec[t] premiums,'" and (4) to

"'receive for services so rendered ... fees or commissions.'"

Barnett Bank, 517 U.S. at 39 (quoting 12 U.S.C. § 92).  The Court

found that "[t]he statute thereby not only focuse[d] directly

upon industry-specific selling practices, but also affect[ed] the

relation of insured to insurer and the spreading of risk -

matters . . . at the core of the McCarran-Ferguson Act's

concern."  Id. at 39.


Soon after Barnett Bank, the appellate court for this

circuit considered whether a provision of the Medicare Secondary-

Payer Act, 42 U.S.C. § 1395y(b), related to the "business of insurance."  RIIIF, 80 F.3d at 622.  The federal provision "explicitly prohibit[ed] private insurers from negotiating or enforcing any insurance-contract term which purports to make Medicare the primary-insurance obligor in lieu of a private insurance carrier, even though authorized by state law."  Id. The court found that the federal provision related to the business of insurance because it "control[ed] the core contract relationship at both the negotiation and performance stages." Id.[9]  Noting that the McCarran-Ferguson Act "seeks to protect state [insurance] regulation primarily against inadvertent federal intrusion," it found that the Act afforded the state law no protection because the federal provision at issue was a clear and "overt federal intervention."  Id. at 620, 622.

---

[9]  In focusing on the "core contract relationship at both the negotiation and performance stage," the court in RIIIF rejected a strict application of the so-called Pireno factors.  In Union Labor Life Ins. Co. v. Pireno, 458 U.S. 119 (1982), the Supreme Court set forth three criteria for assessing whether a practice involves the "business of insurance" for purposes of the second clause of § 2(b) of the McCarran-Ferguson Act.  The second clause addresses whether a given practice is exempt from federal anti-trust laws.  The three Pireno factors are: (1)"whether the practice has the effect of transferring or spreading a policyholder's risk," (2) "whether the practice is an integral part of the policy relationship between the insurer and the insured," and (3) "whether the practice is limited to entities within the insurance industry."  Id. at 129.  In RIIIF, the appellate court for this circuit rejected a strict application of the Pireno factors in cases arising under the first clause of the McCarran-Ferguson Act.  See RIIIF, 80 F.3d at 622.

Here, Section 944 and its Assessment Provision are nothing like the federal provisions at issue in <u>Barnett Bank</u> and <u>RIIIF</u>.[10] As noted, Section 908 of the Longshore Act limits employer liability for second injury compensation.  <u>See</u> 33 U.S.C. § 908(f).  Section 944 supports that goal by creating the Special Fund and making it liable for compensation for second injuries when employer liability ends.  <u>Reich</u>, 42 F.3d at 77.  With respect to its primary function as a reserve for second injury compensation, therefore, the Special Fund operates beyond employer liability and, thus, outside the insurer-insured contract relationship.  Likewise, to the extent the Special Fund operates as a discretionary safety net in the event of employer insolvency, <u>see</u> 33 U.S.C. § 918(b), it does not regulate the core relationship between insurer and insured.  No limitation in

---

[10]  The <u>RIIIF</u> court's citation to <u>Texas Employers' Ins. Ass'n v. Jackson</u>, 820 F.2d 1406, 1414-15 (5th Cir. 1987) does not settle the issue of whether Section 944, and subsection 944(c)(2), relate to the business of insurance.  In <u>Texas Employers'</u>, the Fifth Circuit held that the Longshore Act specifically relates to the business of insurance.  <u>Id</u>.  The <u>RIIF</u> court cited that holding when discussing the meaning of "specifically relates," and for the subsidiary proposition that a federal program or agency need not "technically [be] considered part of the 'business of insurance'" for the relevant federal provision to "specifically relate" to the business of insurance.  <u>See RIIIF</u>, 80 F.3d at 621.  The RIIIF court did not refer to <u>Texas Employers'</u> in its analysis of the "business of insurance" issue. Moreover, although the court in <u>Texas Employers'</u> ruled that the Longshore Act relates to the business of insurance, it did so in the context of deciding whether a claimant's state law bad faith "claim handling" claim against a Longshore Act insurer was precluded by the Act, but not in the context of Section 944.  <u>See</u> <u>Texas Employers'</u>, 820 F.2d at 1410.

either Section 918(b) or Section 944 requires that an insolvent employer, whose default may be covered by the Special Fund, be a self-insured employer.  Moreover, there is no provision in Section 944 providing a safety net in the event of <u>insurance carrier</u> insolvency.  Accordingly, because Section 944 creates a Special Fund that may, in the Secretary's discretion, apply broadly to all insolvent employers, but not at all to insolvent insurance carriers, it simply does not control the  "core relationship between a private insurer and its insured." <u>RIIIF</u>, 80 F.3d at 621.  Neither Section 944, nor the Assessment Provision of subsection 944(c)(2), therefore, seek to dictate "the type of [insurance] policy that could be issued, its reliability, interpretation, and enforcement," nor "the standards governing performance under insurance contracts."  <u>RIIIF</u>, 80 F.3d at 621-22 (quotations omitted).

In reaching this conclusion, the court is mindful of DOL's argument that, by supporting Section 908's narrowing of the scope of employer liability, Section 944 affects, at least indirectly, the scope of insurance coverage employers must secure.  "This argument," however, "goes too far."  <u>Fabe</u>, 508 U.S. at 508.  To be sure, courts should consider a statute's indirect effects when determining whether it relates to the "business of insurance."

See Ruthardt, 303 F.3d at 382.[11]  Here, the asserted indirect effect that Section 944 (including the Assessment Provision of sub-section 944(c)(2)) may arguably have on the scope of insurance coverage obtained by employers is so remote from the statute's purpose, i.e., encouraging employers to hire and retain injured workers, that, even if real, that effect can only be described as an "inadvertent federal intrusion" on the state's regulation of insurance matters.  Section 944 cannot plausibly be construed as specifically relating to the business of insurance, and does not displace the state's priority law.  RIIIF, 80 F.3d at 620 (requiring a "clear statement" of congressional intent to intrude upon state insurance regulation).  See also Pallozzi v. Allstate Life Ins. Co., 198 F.3d 28, 35 (2d Cir. 1999) (even if federal statute is found to relate to the relationship of insured to insurer and the spreading of risk, court must also consider whether the federal intrusion on the state regulation appears deliberate or "inadvertent").

### Conclusion

DOL has not shown a clear and manifest Congressional intent to preempt the state priority law in Section 944, or in the

---

[11]  The appellate court in Ruthardt found that a state law regulated the "business of insurance," in part, because it "indirectly assure[d] that policyholders get what they were promised."  Ruthardt, 303 F.3d at 382.

Assessment Provision of sub-section 944(c)(2).  That law, in any event, is protected from federal intrusion under the McCarran-Ferguson Act.  For those reasons DOL's motion for summary judgment, document no. 29, is denied.  As plaintiff is not entitled to the relief she seeks, as a matter of law, judgment shall be entered in favor of defendants, and the case closed.

   **SO ORDERED.**

                                   _____
                                   Steven J. McAuliffe
                                   United States District Judge
January 27, 2012

cc:  W. Daniel Deane, Esq.
     Kyle Forsyth, Esq.
     J. David Leslie, Esq.
     J. Christopher Marshall, Esq.
     Andrew W. Serrell, Esq.
     Eric A. Smith, Esq.
     Joseph C. Tanski, Esq.